FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

CHRISTIAN ACTION NETWORK,
et al., Defendants.

Civ. A. No. 94–0082–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

June 28, 1995.

Lawrence M. Noble, Richard B. Bader, Stephen E. Hershkowitz, Robert W. Bonham, III, Federal Election Commission, Washington, DC, for Federal Election Commission, plaintiff.

Frank M. Northam, Webster, Chamberlain & Bean, Washington, DC, David William Carroll, Sellman & Boone, Columbus, OH, for Christian Action Network, Inc., Martin Mawyer, defendants.

## MEMORANDUM OPINION

TURK, District Judge.

This civil enforcement action was brought by the Plaintiff, the Federal Election Commission, ("FEC" or "Commission"), against the Defendant, the Christian Action Network, ("CAN"), and its president and chief executive officer, Martin Mawyer, alleging violations of the Federal Election Campaign Act of 1971, as amended 2 U.S.C. §§ 431 et seq. ("FECA" or the "Act").[1] The FEC asserts that the Defendants violated the Act by: (1) using corporate treasury funds to finance political advertisements which expressly advocated the defeat of now President Clinton and Vice President Gore, See 2 U.S.C. § 441b(a); (2) failing to inform the viewing public that the advertisements were authorized by a candidate for federal office or a committee of said candidate or its agents, See 2 U.S.C. § 441d(a)(3); and (3) failing to file public disclosure statements with respect to the expenditures used to finance the advertisements, See 2 U.S.C. §§ 434(c) and 431(11). The FEC seeks civil penalties and injunctive relief as provided for by the Act. See 2 U.S.C. § 437g(a)(6)(C).

The matter is presently before the court on the Defendants' motion to dismiss. The Defendants do not dispute that corporate treasury funds were used to finance the advertisements or that CAN failed to comply with FECA reporting requirements. Instead, the Defendants contend that the advertisements did not expressly advocate the election or defeat of a particular federal candidate. Accordingly, the Defendants argue that the FEC has no authority to regulate the manner in which the advertisements were financed. In the alternative, even if it could be said that the advertisements constituted express advocacy, the Defendants believe the advertisements would still be ex-

---

1. Through an express delegation from the United States Congress, the FEC has exclusive power to bring suit for violations of the Act. See 2 U.S.C. §§ 437d(a)(6) and 437g(a)(6)(A). Therefore, original jurisdiction is vested in this court pursuant to 28 U.S.C. § 1345. Likewise, venue is proper in the Western District of Virginia pursuant to 2 U.S.C. § 437g(a)(6)(A) as both defendants can be found, reside, or transact business in this district.

empt from FECA's prohibitions because they qualify under the "media outlet" exception provided for in 2 U.S.C. § 431(9)(B)(i). Lastly, the Defendants claim that at the time the FEC decided to file this suit, the Commission was unlawfully constituted in violation of the separation of powers. Therefore, the Defendants assert that the FEC lacks legal authority to bring this action.[2]

■ Having carefully reviewed the record, the parties' pleadings, and the pertinent case and statutory law, the court finds that it must grant the Defendants' motion. The advertisements at issue do not contain explicit words *or imagery* advocating electoral action. On the contrary, the advertisements represent a form of issue advocacy intended to inform the public about political issues germane to the 1992 presidential election. Therefore, the advertisements are fully protected as "political speech" under the First Amendment. Their financing is not governed by FECA and the FEC lacks jurisdiction to bring this suit.

### Factual Background

The undisputed facts are as follow. The Christian Action Network is a nonprofit corporation created in 1990 under the laws of the Commonwealth of Virginia. CAN is a grass-roots organization that seeks to inform the public about issues which it believes affect "traditional Christian family values." During the weeks leading up to the November 3, 1992 presidential election, CAN spent approximately sixty-three thousand dollars, ($63,000.00), from its general treasury fund to produce television and print advertisements. These advertisements assailed what the Defendants believed to be the militant homosexual agenda of the Democratic candidates for president and vice-president, William Jefferson Clinton and Albert Gore, Jr. (hereinafter "Bill Clinton" and "Al Gore").

The television advertisement consisted of a thirty second spot entitled "Clinton's Vision for a Better America."[3] It opens with a full-color picture of candidate Bill Clinton's face superimposed upon an American flag, which is blowing in the wind. Clinton is shown smiling and the ad appears to be complimentary. However, as the narrator begins to describe Clinton's alleged support for "radical" homosexual causes, Clinton's image dissolves into a black and white photographic negative. The negative darkens Clinton's eyes and mouth, giving the candidate a sinister and threatening appearance. (Pl.'s Ex. 5, *attached to this Memorandum Opinion as photos one and two.*) Simultaneously, the music accompanying the commercial changes from a single high pitched tone to a lower octave.

The commercial then presents a series of pictures depicting advocates of homosexual rights, apparently gay men and lesbians, demonstrating at a political march. While the narrator discusses the candidates' alleged agenda for homosexuals, short captions paraphrasing their positions are superimposed on the screen in front of the marchers. These images include: marchers carrying a banner saying "Libertarians for Gay and Lesbian Concerns" accompanied by the superimposed text "Job Quotas for Homosexuals"; the same banner accompanied by the superimposed text "Special Rights for Homosexuals"; two individuals with their arms around each others shoulders and text saying "Homosexuals in the Armed Forces"; and a man wearing a shirt which reads "Gay Fathers" with the text "Homosexuals Adopting Children."

---

**2.** Perhaps anticipating a potential defense, the FEC has argued that the Defendants do not fall under the judicially created exception to § 441b first enunciated in *Federal Election Com. v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), and reaffirmed in *Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Because the Defendants did not raise the issue in their motion to dismiss and because its resolution would not affect the outcome of the court's decision, it will not be addressed herein.

**3.** Between September 26 and November 2 of 1992, the television commercial was broadcast on at least 250 occasions in twenty-four cities throughout the country. The commercial was broadcast up until November 2, 1992, the day before the presidential election took place. In addition to the regular broadcasting of the commercial, copies of the ad were also sent by CAN to group contributors.

(Pl.'s Ex. 5 *attached to this Memorandum Opinion as photos three through seven.*)

As the scenes from the march continue, the narrator asks in rhetorical fashion, "Is this your vision for a better America?" Thereafter, the image of the American flag reappears on the screen, but without the superimposed image of candidate Clinton. At the same time, the music changes back to the single high pitched tone. The narrator then states, "[f]or more information on traditional family values, contact the Christian Action Network."[4] (Pl.'s Ex. 5 *attached to this Memorandum Opinion as photo eight.*)

Shortly after CAN's television commercial began airing, the Chairman of the Democratic National Committee, Ron Brown, wrote a letter to various television stations and cable operators. In his letter, Chairman Brown asked the television media to discontinue running the commercial because he believed it to be "patently offensive" and "false." In response to this letter, CAN published a full page advertisement on October 15, 1992 in the *Richmond Times–Dispatch.* This date was approximately two weeks after the television commercial had begun airing. It also coincided with a nationally televised debate among the 1992 presidential candidates, which was held that evening in Richmond, Virginia. The newspaper advertisement was entitled "An Open Letter To: Gov. Bill Clinton, Democratic Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman", and stated that it was "paid for by the Christian Action Network...." Importantly, however, the advertisement failed to state whether it was authorized by any candidate or committee. The body of the letter reads as follows:

The Christian Action Network is now airing television ads in Richmond, VA *informing the voting public* of Gov. Bill Clinton's support of the "gay rights" political agenda.

*The voting public has a right to know* that Gov. Bill Clinton's agenda includes (1) job quotas for homosexuals, (2) special civil rights for homosexuals and (3) allowing homosexuals in the U.S. Armed Forces.

Not surprisingly, the Democratic leadership has opposed our television ads.

That's why Ron Brown, chairman of the Democratic National Committee, is now sending letters to television and cable operators asking them not to run our advertisement.

In his letter, Mr. Brown accuses our ads of being "patently offensive" and "false." But the letter fails to point out any "false" or "patently offensive" information in our ad campaign.

Here are the documented facts in defense of our ads which have also aired in Los Angeles, Houston, Cincinnati, Washington, D.C., Atlanta, San Diego, Seattle, Dallas, Santa Rosa, Cleveland, Chicago and other major cities.

**First,** Gov. Clinton supports civil rights laws for homosexuals.

From a Clinton/Gore campaign paper titled, "Issues of Concern to Gays and Lesbians" are these words "A Clinton/Gore Administration will support a federal gay civil rights bill." This position paper was received from the Democratic National Committee and paid for by the "Clinton/Gore '92 Committee."

**Second,** Gov. Clinton will allow homosexuals in the military.

From the same position paper cited above: "Bill Clinton will issue executive orders to repeal the ban on gays and lesbians from military and foreign service."

**Third,** Gov. Clinton supports job quotas for homosexuals.

The Democratic Party Platform states it will "provide civil rights protection for gay men and lesbians."

George Stephanopoulos, Mr. Clinton's spokesman, said Gov. Clinton supports affirmative action for gays and lesbians be-

---

4. The audio text of the video, in its entirety, is as follows:

Bill Clinton's vision for America includes job quotas for homosexuals, giving homosexuals special civil rights, allowing homosexuals in the armed forces. Al Gore supports homosexual couples' adopting children and becoming foster parents. Is this your vision for a better America? *For more information on traditional family values, contact the Christian Action Network.* (emphasis added).

cause laws were needed to protect workers' rights. Gov. Clinton has also promised that he will "appoint gays and lesbians to major positions in his administration." [Washington Post September 28, 1992]

The Christian Action Network has informed Gov. Bill Clinton and DNC Chairman Ron Brown that it will change its commercial if Clinton will publicly dispute any point made in CAN's commercial, promise as president to veto legislation that gives gays specific protection under the Civil Rights Act and oppose affirmative action for gays.

The Christian Action Network has yet to hear verbal or written communication from Gov. Clinton, Mr. Brown or any other official of the Democratic National Party.

During tonight's debate—or anytime thereafter—I, Martin Mawyer, president of the Christian Action Network, call upon Gov. Bill Clinton to clearly state his position on gay rights and publicly state what is "patently offensive" and "false" in our television commercial.

When the Clinton/Gore campaign committee publicly and unequivocally retract their commitments to the "gay rights" community, the Christian Action Network will halt its television campaign. (Pl.'s Ex. 2.) (emphasis added).

CAN never received a response from the Clinton election team or any member of the Democratic National Committee. As a result, on October 26, 1992, the Defendants placed another full page newspaper ad. This time the advertisement was published in the *Washington Times* and was entitled "Since You Did Not Respond to Our Ad in Richmond; An Open Letter To: Gov. Bill Clinton, Democratic Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman." The second newspaper ad was substantively identical to its predecessor. However, the second ad contained a statement that it was not authorized by any candidate. Further-

more, it failed to state that it was a paid political advertisement.

### Motion to Dismiss Standard

 On a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Revene v. Charles County Com'rs*, 882 F.2d 870, 872 (4th Cir.1989).

### FECA Section 441b(a) and the Express Advocacy Standard

A literal reading of FECA section 441b(a) suggests that corporate entities are strictly prohibited from using general treasury funds to make independent expenditures in connection with federal elections.[5] The provision states:

> It is unlawful for ... any corporation whatever ... to make a contribution or expenditure in connection with [Federal elections] ... or any officer or director of any corporation ... to consent to any contribution or expenditure by the corporation prohibited by this section. 2 U.S.C. § 441b(a); *see also* 11 C.F.R. § 114.3(a)(1) (1995).

 However, a significant judicial gloss has been read into section 441b making the provision's ban less severe than it initially appears. Specifically, before an expenditure is subject to the prohibition of § 441b, it must be found to "expressly advocate" the election or defeat of a "clearly identified" federal candidate. *Federal Election Com. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 249, 107 S.Ct. 616, 623, 93 L.Ed.2d 539 (1986), (hereinafter "*MCFL*").

---

5. By its own terms, FECA does not prohibit all political speech by corporate entities. In particular, the Act allows corporations to set up separate segregated funds to collect voluntary contributions in support of or against particular candidates. By earmarking the funds in this manner, it is believed that there will be fewer instances in which general corporate funds are used: (1) to gain actual or perceived influence over candidates; and (2) in a manner antagonistic to the political views of certain shareholders. *See* 2 U.S.C. § 441b(b)(2)(C); *see also* 11 C.F.R. § 114.5 (1995).

The "express advocacy" standard embraced by the Court in *MCFL* was taken from the seminal case addressing the constitutionality of FECA, *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In *Buckley,* the Court was asked to interpret the scope of FECA's disclosure requirements for expenditures made by individuals other than candidates and by groups other than political committees. 18 U.S.C. § 608(e)(1), as amended, 2 U.S.C. § 434(c). In reaching its decision to adopt an "express advocacy" standard, the Court recognized the severe impingement on political speech that would occur if the Act was interpreted too broadly. Particularly significant to the Court was the inherent difficulty in distinguishing discussions of election issues and candidates from more candid exhortations to vote for or against a particular individual. As the *Buckley* Court explained:

> [T]he distinction between discussion of issues and candidates and advocacy of election and defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest. *Buckley,* 424 U.S. at 42 [96 S.Ct. at 646].
>
> \* \* \* \* \* \*
>
> Public discussion of public issues which also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections. *Buckley,* 424 U.S. at 42 n. 50 [96 S.Ct. at 646 n. 50] (*quoting* the appellate court 171 U.S.App. D.C., [172] at 226, 519 F.2d [821] at 875.)

Therefore, in order for the disclosure requirement to avoid being constitutionally infirm, the Court held that the term "expenditure" had to be construed to apply "only to expenditures that *in express terms advocate the election or defeat of a clearly identified candidate* for federal office." *Buckley,* 424 U.S. at 44, 96 S.Ct. at 646–47. (emphasis added). As guidance, the Court went on to suggest certain language that it believed could properly be labeled "express advocacy." "[The Court's] construction would restrict the application of [the disclosure provision] to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject." *Id.* at n. 52.

In the nineteen years since the Supreme Court's ruling in *Buckley v. Valeo,* the parameters of the "express advocacy" standard have been addressed by several federal courts in a variety of circumstances. *Faucher v. Federal Election Com.,* 928 F.2d 468 (1st Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991) (pro-life voter guide); *Federal Election Com. v. Furgatch,* 807 F.2d 857 (9th Cir.), *cert. denied,* 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987) (newspaper advertisements criticizing President Carter); *Federal Election Com. v. Central Long Island Tax Reform Immediately Committee,* 616 F.2d 45 (2nd Cir.1980) ("Central Long Island Tax Reform") (bulletin criticizing voting record of local congressman); *Federal Election Com. v. Survival Education Fund, Inc.,* No. 89 Civ. 0347 (TPG), 1994 WL 9658 (S.D.N.Y. Jan. 12, 1994) ("*SEFI* ") (letters criticizing the Reagan Administration's military involvement in Central America); *Federal Election Com. v. Colorado Republican Fed. Campaign Comm.,* 839 F.Supp. 1448 (D.Colo.1993) ("*Colorado Rep. C.C.*") (radio advertisement attacking Senate candidate's alleged positions on defense spending and balanced budget issues); *Federal Election Com. v. National Organization for Women,* 713 F.Supp. 428 (D.D.C.1989) ("*NOW* ") (mailings attacking certain members of Congress for their political views in opposition to abortion rights and the ERA); *Federal Election Com. v. American Federation of State, County & Municipal Employees,* 471 F.Supp. 315 (D.D.C.1979) ("*American Federation* ") (Nixon–Ford poster distributed to union members criticizing the Watergate pardon).

Acknowledging that political expression, including discussion of public issues and debate on the qualifications of candidates, enjoys extensive First Amendment protection, the vast majority of these courts have adopted a strict interpretation of the "express advocacy" standard. *See Central Long Island Tax Reform*, 616 F.2d at 53 ("[C]ontrary to the position of the FEC, the words 'expressly advocating' means exactly what they say.... [T]he FEC would apparently have us read 'expressly advocating the election or defeat' to mean for the purpose, express *or implied*, of encouraging election or defeat. This would, by statutory interpretation, nullify the change in the statute ordered by *Buckley*...."). Thus, courts generally have been disinclined to entertain arguments made by the Commission that focus on anything other than the actual language used in an advertisement. *Faucher*, 928 F.2d at 472 ("In our view, trying to discern when issue advocacy in a voter guide crosses the threshold and becomes express advocacy invites just the sort of constitutional question the [Supreme] Court sought to avoid in adopting the bright-line express advocacy test in *Buckley*."); *Colorado Rep. C.C.*, 839 F.Supp. at 1456 ("Trying to determine whether the surrounding circumstances, coupled with the implications of the [a]dvertisement, constitute 'express advocacy' leads to the type of semantic dilemma which the [Supreme] Court sought to avoid by adopting a bright-line rule.")

The one notable exception, on which the FEC relies heavily in the instant case, is the Ninth Circuit's decision in *FEC v. Furgatch*.[6] In *Furgatch*, the defendant placed a full page advertisement in two metropolitan newspapers during the week leading up to the 1980 presidential election. The advertisement was entitled "DON'T LET HIM DO IT" and was extremely critical of incumbent President Carter. It stated that, "[t]he President of the United States continues degrading the electoral process and lessening the prestige of the office." *Furgatch*, 807 F.2d at 858. In addition, it characterized President Carter's campaign strategy as "cultivat[ing] fears, not the hopes, of the voting public by suggesting the choice is between 'peace and war,' 'black or white,' 'north or south,' and 'Jew vs. Christian.'" *Id.* The advertisement concluded, "[i]f [President Carter] succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning ... DON'T LET HIM DO IT." *Id.*

At the outset, the Ninth Circuit stated that it believed the "express advocacy language of *Buckley* ... [did] not draw a bright and unambiguous line" and that it was therefore compelled "to interpret and refine the standard...." *Id.* at 861. The Ninth Circuit then argued that an advertisement should not be required to contain the "magic words" provided by the *Buckley* Court in order to constitute "express advocacy" and fall under the auspices of FECA.[7] The better approach, the appellate court reasoned, was to view the communication in its entirety. This would include giving at least some weight to the timing and context of the advertisement. *Id.* at 863–64. Only if the speech, "when read as a whole, and with limited reference to external events ... [is] susceptible of no other reasonable interpretation than an exhortation to vote for or against a specific candidate" can it properly be characterized

---

**6.** Although the FEC does not expressly state that this court should adopt the Ninth Circuit's approach, it is clear that the agency's argument, with its emphasis on the context in which the speech was presented, most closely parallels the *Furgatch* analysis. *See* (Pl.'s Mem. in Opp. at 18–20, 28–29). In fact, as will be explained, the FEC's proposed analysis would go beyond even the Ninth Circuit's more generous approach. *See infra* at 955.

**7.** The Ninth Circuit explained its reasoning as follows:

[E]xpress advocacy is not strictly limited to communication using certain key phrases. The short list of words included in the Supreme Court's opinion in *Buckley* does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate. A test requiring the magic words "elect," "support," etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the Federal Election Campaign Act.

*Federal Election Com. v. Furgatch*, 807 F.2d 857, 863 (9th Cir.1987).

as express advocacy. *Id.* at 864. In summation, the Ninth Circuit presented the following three part test.

> First, even if it is not presented in the clearest, most explicit language, speech is "express" for the present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of election or defeat of a candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action. *Id.*

Applying its "more comprehensive approach," the *Furgatch* Court found that the defendant's advertisement represented express advocacy. This was true despite the fact that the advertisement failed to state the precise action called for, but rather left the reader with an "obvious blank" to fill in. *Id.* at 865. Considering the timing of the advertisement, appearing less than a week before the election, and the fact that it repeatedly referred to the election campaign, the Ninth Circuit found that "reasonable minds could not dispute that [the] advertisement urged readers to vote against Jimmy Carter." *Id.* Therefore, the Court concluded there was no real ambiguity as to what the phrase "DON'T LET HIM DO IT" meant and the advertisement was found to be subject to FEC regulation.

### The Defendants' Advertisements Did Not Expressly Advocate the Defeat of Candidates Clinton and Gore

Having thoroughly reviewed the case law addressing the "express advocacy" standard, the court finds that the Defendants' advertisements are not subject to regulation under FECA. This is true whether CAN's television commercial is viewed individually or in conjunction with the two print advertisements. Concededly, the advertisements "clearly identified" the 1992 Democratic presidential and vice presidential candidates. Bill Clinton's face was prominently

displayed in the television commercial and both Clinton and Gore were mentioned by name in all three advertisements. Similarly, it is beyond dispute that the advertisements were openly hostile to the proposals believed to have been endorsed by the two candidates. Nevertheless, the advertisements were devoid of any language that directly exhorted the public to vote. Without a frank admonition to take electoral action, even admittedly negative advertisements such as these, do not constitute "express advocacy" as that term is defined in *Buckley* and its progeny. *See Colorado Rep. C.C.*, 839 F.Supp. at 1455 ("Even assuming the [a]dvertisement indirectly discourages voters from supporting [the candidate], it does not contain a direct plea for specific action required from *Buckley* and *Furgatch*."); *SEFI*, 1994 WL 9658 at *3 ("It is clear from the cases that expressions of hostility to the positions of an official, implying that [the] official should not be reelected—even when that implication is quite clear—do not constitute the express advocacy which runs afoul of [FECA]."); *American Federation*, 471 F.Supp. at 317 ("[A]lthough the poster includes a clearly identified candidate and may have tended to influence voting, it contains communication on a public issue widely debated during the campaign.... [a]s such, it is the type of political speech which is protected from regulation.").

CAN's television commercial addressed political issues. It informed the public on what the organization believed to be the "gay agenda" of the Democratic candidates. Specifically, the commercial questioned whether homosexuals should be afforded protection under federal civil rights laws. It also questioned the propriety of integrating homosexuals into the armed services and permitting their adoption of children. Moreover, through the use of the narrator's rhetorical question at the end of the commercial—"Is this your vision of a better America?"—the Defendants made it clear that they were adamantly opposed to such action.

At the same time, despite the *implication* that the Democratic candidates favored such changes, nowhere in the commercial were viewers asked to vote against them. As the

Defendants correctly note, the November general election, the political party of the candidates, and their potential opponents were never even mentioned during the commercial. Instead, viewers were presented with the candidates' views on homosexual rights and told that they sharply contrasted with those held by the Defendants.[8] The only immediate action called for by the commercial was for viewers to contact CAN if they agreed with the Defendants' opposition to a "gay rights agenda." As the final statement in the commercial instructed, "[f]or more information on traditional family values contact the Christian Action Network." *See NOW*, 713 F.Supp. at 435 (defendant did not go beyond issue discussion to express advocacy; it merely attempted to make its views known and gain new members).

■ With respect to the two newspaper advertisements, the court, again, cannot agree with the Commission that the Defendants urged the public to take electoral action. The print advertisements merely reiterated the candidates' positions on homosexual rights that had been presented in CAN's television commercial. It is true that the print ads stated "the *voting* public needs to know ... Gov. Bill Clinton's agenda" and described CAN's television commercial as "informing the *voting* public of Gov. Bill Clinton's support for the 'gay rights' political agenda." It is also true that the print ads identified the Democratic Party and referred to the Richmond presidential debate. However, informing the public of a candidate's

political views, even when the reader is addressed as a member of the voting public, does not *per se* translate into an exhortation to vote.[9] *SEFI*, 1994 WL 9658 at *2 (mock election survey used "to educate Americans who will be voting."); *NOW*, 713 F.Supp. at 431 (letter telling readers that by voting for or against a politician they could fight unequal treatment of women).

Furthermore, it is clear that the only reason the print ads referred to the Democratic party and Richmond presidential debate was because the Defendants wanted some individual, either from the Clinton campaign team or the Democratic National Committee, to state publicly and unequivocally the candidates' position on homosexual rights. Therefore, any call for action encompassed in the advertisements was directed at the candidates and Chairman Brown, not the voting public. The ads asked Clinton and Gore to retract their alleged support for a "homosexual agenda," and challenged Chairman Brown to identify what he believed was "patently offensive" and "false" about CAN's television commercial. Simply put, even if one views the advertisements' request for the Democratic leaders to clarify their views on homosexual rights as dubious or juvenile baiting, it cannot reasonably be said that the import of the ads was to instruct the public on how they should vote.[10]

■ The issue of gay rights addressed by the CAN's television commercial and newspaper ads raised strong emotions amongst viewers and readers. However, there is no

---

**8.** It is worth noting that the Republican candidates did not embrace CAN's commercial, but rather distanced themselves from it. *See* (Pl.'s Ex. 12) ("[Republican] spokesman for Bush–Quayle '92, said the advertisement would not be sanctioned by the campaign.... [President] Bush has spoken out against hate crimes and intolerance to gays.").

**9.** The FEC also points to contemporaneous press statements made by spokesmen for CAN, including Defendant Mawyer as president of the organization, in which they stated that the purpose of the television commercial was to educate the "voting" public about the Clinton/Gore position on homosexual rights. *See* (Pl.'s Mem. in Opp. at 16 n. 11.) Even if the court were to consider these random statements in conjunction with the advertisements, they do not suggest that the Defendants did anything other than inform the pub-

lic about their views on an election issue. *See Furgatch*, 807 F.2d at 863 (stating that a speaker's intent is less important than the message conveyed by the speech itself because the speaker may expressly advocate regardless of his intention); *Federal Election Com. v. Colorado Republican Fed. Campaign Comm.*, 839 F.Supp. 1448, 1456 (D.Colo.1993) (rejecting the FEC's argument that contemporaneous press statements made by officers for the Defendant's organization were relevant to the court's analysis.)

**10.** As impractical as it undoubtedly was, the suggestion in the newspaper advertisements that the CAN would refrain from running its television commercial if candidate Clinton would publicly state that he did not support a "gay rights agenda" indicates that the focus of the Defendants' attack was on the candidate's positions on an election issue.

requirement that issue advocacy be congenial or non-inflammatory. Quite the contrary, the ability to present controversial viewpoints on election issues has long been recognized as a fundamental First Amendment right. *See Buckley*, 424 U.S. at 14–15, 96 S.Ct. at 632–33 ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our constitution."); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949) ("[T]he function of free speech under our system of government is to invite dispute.... [i]t may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."); *Central Long Island Tax Reform*, 616 F.2d 45, 53 ("[T]he right to speak out at election time is one of the most zealously protected under our constitution."); *NOW*, 713 F.Supp. at 435 ("The [defendant's] solicitation letters contained strong sentiments and dramatic statements, but this only reflects our 'profound national commitment to the principal that debate on public issues should be uninhi-

bited, robust, and wide-open.' ") (citing *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). Therefore, the court believes the Defendants' advertisements represent the very type of issue advocacy the *Buckley* Court sought to exempt from government regulation.

### The FEC's Proposed Approach to the Express Advocacy Standard is Legally and Logistically Untenable

■ The FEC seeks to avoid the weight of authority calling for a strict interpretation of the "express advocacy" test by arguing that the instant case is unique.[11] Unlike previous decisions which dealt exclusively with print and radio advertisements, the FEC argues that a different analysis is appropriate when, as here, a television commercial is at issue. According to the FEC, a different standard is justified because imagery and other more subtle forms of non-verbal communication used in the television medium are sufficient to meet the *Buckley* express advocacy standard. The FEC finds support for this contention from the *Buckley* decision itself,[12]

**11.** According to the FEC, the decisions cited by the Defendant are readily distinguishable.

Defendants' emphasis upon the references of prior decisions to "words" of advocacy ... is misplaced because those cases all involved textual communications rather than television advertisements.... *Massachusetts Citizens For Life* and all of the other decisions cited by the defendants involved only the spoken or textual communications, and those decisions must be read in that context.

In contrast, the television advertisements financed by the defendants are much more complex and sophisticated communications. In addition to the written and spoken text, the CAN video contains numerous non-verbal components, such as the changing visual images, the accompanying "music" and even the various video editing and production techniques utilized to create the commercial. In political advertising, each of these components or techniques is carefully designed to capture viewer attention and convey a particular message. (Mem. in Opp. at 20–21.)

**12.** In *Buckley v. Valeo*, the Court stated that it was adopting the express advocacy standard so that FECA would not infringe unnecessarily upon the First Amendment. To clarify the type of *particularity* that would be required to meet the express advocacy standard, the Court referred to the Act's definition of the term "clearly identified." *See* former § 608(e)(2).

Section 608(e)(2) defines "clearly identified" to require that the candidate's name, photograph or drawing, or other unambiguous reference to his identity appear as part of the communication. Such other unambiguous reference would include use of the candidate's initials (e.g., FDR), the candidate's nickname (e.g., Ike), his office (e.g. the President or the Governor of Iowa), or his status as a candidate (e.g., the Democratic presidential nominee, the senatorial candidate of the Republican Party of Georgia). *Buckley*, 424 U.S. at 43–44 n. 51, 96 S.Ct. at 646 n. 51.

Citing this footnote, the FEC argues that the Supreme Court has made "it clear that unambiguous imagery, and not only words, could satisfy the constitutional requirements it had identified." (Pl.'s Mem. in Opp. at 12); *see also* (Pl.'s Mem. in Opp. at 17) ("*Buckley* itself indicates that the constitutional standard can be satisfied by visual imagery alone....").

The court finds this reasoning suspect. It is doubtful that the *Buckley* Court ever contemplated the possibility that imagery could be sufficiently explicit to meet the express advocacy standard. The language used by the *Buckley* Court in enunciating the standard certainly does not suggest so. "The constitutional deficiency described in *Thomas v. Collins* can be avoided only by reading § 608(e)(1) as limited to communications that include explicit *words* of advocacy...." *Buckley*, 424 U.S. at 42, 96 S.Ct. at 646.

and from several First Amendment decisions in which non-verbal communication has been recognized as protected political speech.[13] *See United States v. Eichman,* 496 U.S. 310, 316 n. 6, 110 S.Ct. 2404, 2408, 110 L.Ed.2d 287 (1990); *Texas v. Johnson,* 491 U.S. 397, 405, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989); *Spence v. Washington,* 418 U.S. 405, 410, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974); *Dunn v. Carroll,* 40 F.3d 287, 291 (8th Cir.1994); *Students Against Apartheid Coalition v. O'Neil,* 671 F.Supp. 1105, 1106 (W.D.Va.), *aff'd,* 838 F.2d 735 (4th Cir.1988).

Especially significant, the FEC argues, is the strong message conveyed by the use of the American flag in the CAN television commercial. According to the FEC, the television advertisement "makes its anti-Clinton message explicit by concluding with the same full-color image of the rippling flag as opened the commercial—but without the superimposed image of Clinton." (Pl.'s Mem. in Opp. at 28.) "By graphically removing Clinton's superimposed image from the presidential setting of the American flag, the advertisement visually conveys the message that Clinton should not become president." *Id.* "[It] is a powerful visual image telling voters to defeat Clinton." *Id.*

In addition to the symbolic use of the American flag, the FEC notes several other aspects of CAN's television commercial which it believes are relevant to the court's express advocacy analysis. These include: (1) the visual degrading of candidate Clinton's picture into a black and white negative; (2) the use of visual text and audio voice-overs; (3) ominous music; (4) unfavorable coloring; (5) codewords such as "vision" and "quota;" (6) issues raised that are relevant only if candidate Clinton became president; (7) the airing of the commercial in close proximity to the national election; and (8) abrupt editing linking Clinton to the images of the gay rights marchers.[14]

"This construction would restrict the application of § 608(e)(1) to communications containing express *words* of advocacy...." *Id.* at 44 n. 52, 96 S.Ct. at 647 n. 52. Additionally, the court believes the FEC's contention is flawed on a more practical level. When a picture or life-like caricature is used in a political advertisement it will generally identify a particular candidate in unmistakable terms. That is, it will "clearly identify" the candidate. The same cannot be said with respect to "express advocacy" of electoral action. The court is not aware of any universally accepted symbol that unambiguously indicates "vote for" or "vote against" a particular candidate. *See infra* n. 16.

**13.** It is ironic that, as support for its position, the FEC seizes upon the body of First Amendment cases in which non-verbal communications have been held to represent political speech. In every case cited by the Commission, the question confronted by the courts was whether the statute at issue was overly broad and chilled political speech. In those cases, the courts interpreted the symbolic speech at issue expansively so as to protect individual's First Amendment rights. The FEC turns the spirit, if not the letter, of the law in these decisions on its head by arguing that they support *more expansive government regulation of political speech.* One can only wonder if the tribunals that decided those cases ever intended such a peculiar result.

**14.** The FEC has submitted a twenty-four page analysis of the advertisements prepared by an expert in Political Science and federal campaign ads. The analysis highlights the more subtle features of the advertisements. A brief summary of the analysis follows.

The Christian Action Network *television ad* expressly advocated the defeat of Clinton and Gore in a number of specific ways: the visual degrading of the Clinton picture, colors used which were unfavorable to Clinton, music which was ominous for Clinton, unfavorable visual images were associated with Clinton and Gore, Clinton and Gore were attacked for extremist homosexual rights which are bad for America, visual text and audio voice-overs used which criticized Clinton and Gore, abrupt edits linked Clinton to negative visual images of extremist homosexual rights, issues raised which were relevant only if Clinton became president, *vision codeword* used in the 1992 campaign, *quota codeword* used that was unfavorable to Clinton, the visual disappearance of Clinton at the end of the ad, and the close proximity of the television ad to the national election. In their totality and in the context of a presidential general election campaign, these twelve points communicated the message that voters should defeat Clinton and Gore because these candidates favor extremist homosexuals who are bad for America. (Pl.'s Ex. 5 at 20.) The subject matter raised in the *print ads* is virtually identical to the ones aired in the text of the television ad (though the print ads lack the graphic visual imagery of television pictures). The newspaper ads identify Bill Clinton and Al Gore, Jr. with support for homosexual rights, name them as Democratic candidates, attack Clinton and Gore on homosexual rights that are bad for America, and urge "the voting public" to oppose Clinton's agenda and defeat Clinton in the upcoming election.

Lastly, the FEC argues that the message conveyed by the imagery of CAN's television commercial was unquestionably linked to the message in the organization's print advertisements.[15] As such, the Commission argues that all three advertisements must be viewed collectively. "In view of [the] plain election nexus, the specific reference to the television commercial thereby incorporating that commercial as part of the message, and the publication of the two newspaper advertisements in the closing weeks of the presidential election campaign, these advertisements constitute a clear message to '[t]he voting public' to reject candidates Bill Clinton and Al Gore." (Compl. at 11.)

While the approach to the "express advocacy" standard proposed by the Commission is resourceful, the court cannot accept it. Under the Commission's approach, courts would be asked to consider not only the words used in a television advertisement, but also more nebulous characteristics such as the ad's use of color, music, tone, and editing. The Supreme Court's decision in *Buckley* simply does not permit this type of judicial inquiry.[16] In *Buckley*, the Court recognized that, depending on the audience, the language used in a political communication can be interpreted to have a variety of meanings. What one person sees as an exhortation to vote, the Court reasoned, another might view as a frank discussion of political issues.

> [W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. *In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of varied understanding of his*

---

The ad in the *Richmond Times–Dispatch* coincided with a major event in the fall campaign, a nationally televised debate between Bill Clinton, George Bush, and Ross Perot. The ad ran the same day as the presidential debate held in Richmond and the October 15 ad explicitly mentioned this campaign debate in its text. This ties the ad to the electoral discourse and shows the group attempted to influence the outcome of the presidential election by defeating Clinton and Gore. (Pl.'s Ex. 5 at 22.)

The court finds the expert's analysis unpersuasive for several reasons. First, the fact that an expert was needed to enlighten the court on the message conveyed by the communications strongly suggests that they did not directly exhort the public to vote. Second, the concepts used by the FEC's expert contradict his claim that a clear message was conveyed. For example, the term "codeword" cannot, by its very definition, be said to express a direct message. Lastly, nowhere in the expert's analysis does he state the *legal* standard or test on which he basis his opinion that the ads constituted "express advocacy."

**15.** The implicit assumption made by the FEC is that an individual who had seen the television commercial would have also read the print advertisements or vice versa.

**16.** The practical difficulty in applying the "more than express words" analysis advocated by the FEC is evident in this case. The FEC has suggested that a photo of Bill Clinton with the international stop sign superimposed on it would be an example of imagery that expressly advocated the defeat of a candidate.

To take an obvious example, if someone published a photograph of Bill Clinton upon which the international stop signal was superimposed ... there could be little doubt that such imagery conveyed just the sort of unambiguous message opposing Clinton that the Supreme Court contemplated in *Buckley*.... In the context of an election campaign, such a photograph literally would tell viewers to reject or defeat Clinton.... The electoral message is just as clear as if the speaker had said "reject Clinton." ... Although the Defendants used slightly different symbols here, the impact of the message is the same. (Pl.'s Mem. in Opp. at 21 and Ex. 5 at 11, *attached to this Memorandum Opinion as photo nine.*)

The court is inclined to disagree. Depending on what accompanied the image, the international stop sign might communicate several different messages to the viewer besides voting against the candidate. This would be true even if such symbolism was used during an election campaign.

Regardless, assuming arguendo that the FEC is correct and imagery can constitute express advocacy, the court finds absolutely no merit in the Commission's claim that the imagery used by CAN, the black and white negative photo of Bill Clinton and the removal of his image from the American flag, is "like the international stop sign urging the defeat of a candidate during an election campaign." (Pl.'s Mem. in Opp. at 28.) The only clear message that was conveyed by the imagery in CAN's television commercial was the Defendants' firm opposition to the expansion of homosexual rights.

*hearers and consequently of whatever inference may be drawn as to his intent and meaning.*

Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim. *Id.* at 424 U.S. at 43 [96 S.Ct. at 646] (*citing Thomas v. Collins,* 323 U.S. 516, 535, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945)). (emphasis added).

Therefore, in order to avoid the possibility that a speaker's intent or meaning would be misinterpreted, the Court in *Buckley* limited FECA's restrictions to communications containing express words of advocacy. By creating a bright-line rule, the Court ensured, to the degree possible, that individuals would know at what point their political speech would become subject to governmental regulation.

It takes little reflection to realize that messages conveyed by imagery are susceptible to even greater misinterpretation than those that are conveyed by the written or spoken word.[17] Consequently, if courts were to begin considering the images created by a communication to determine if a call to electoral action was present, the likelihood that protected speech would be chilled would be far greater. Given this inevitable result, the court cannot accept the FEC's invitation to delve into the meaning behind an image. To expand the express advocacy standard enunciated in *Buckley* in this manner would be to render the standard meaningless. Such an expansion of the judicial inquiry would open the very Pandora's Box which the Supreme Court consciously sought to keep closed.

The Commission's approach is also flawed because it is based on a misreading of the Ninth Circuit's decision in *Furgatch*. In *Furgatch*, the appellate court expressed its concern that by unnecessarily focusing on the "magic words" presented in *Buckley* and ignoring the context in which speech is presented, courts would "preserve the First Amendment at the expense of eviscerating the Federal Election Campaign Act." *Furgatch*, 807 F.2d at 863. At the same time, however, the panel was careful to note that the context of the speech cannot be the preeminent factor in a court's analysis in light of the express dictates of *Buckley*:

First Amendment doctrine has long recognized that words take part of their meaning and effect from the environment in which they are spoken. When the constitutional and statutory standard is "express advocacy," however, the weight that we give to the context of speech declines considerably. Our concern here is with the clarity of the communication rather than its harmful effects. Context remains a consideration, but an ancillary one, peripheral to the words themselves. *Id.*

The FEC ignores this caveat and distorts the holding in *Furgatch* by attaching undue significance to the timing of the Defendants' advertisements. Repeatedly, the Commission insists that because the Defendants' advertisements appeared just prior to the general election they conveyed a singular message—vote against candidates Clinton and Gore.[18] Such a "magic timing" approach is no better than one which insists upon the presence of the "magic words" found in *Buckley* and it would lead to anomalous results.[19] As the court explained to the parties

---

**17.** If the adage "a picture is worth a thousand words" is accurate, then the difficulty in interpreting a message conveyed by a picture is undoubtedly far greater than one conveyed by mere words.

**18.** The following is the relevant discussion from oral argument.

Court: Is it the timing of these advertisements what you say makes them illegal? If they had come after the election ... they would have been alright?

FEC: ... yes, your Honor.

Court: So the First Amendment would protect them after the election but not before?

FEC: Yes, in *Buckley* the Supreme Court emphasized that it was limiting [FECA's] application to spending that was unambiguously related to the campaign of a particular candidate. After the election is over, that wouldn't be the case ... unless it related to a future campaign by that candidate.

**19.** For example, under such an analysis, the same political communication could be regulated by FECA if it appeared on November 2 of an election year, and yet be fully protected under the First Amendment if it were aired a week later.

during oral argument, the First Amendment does not include a proviso stating "except in elections" and the court refuses to accept an approach to the express advocacy standard that would effectuate such a result.

Further, the court believes the *Furgatch* decision is readily distinguishable from the instant case because of the nature of the advertisement at issue. At the conclusion of the Ninth Circuit's opinion, the Court characterized the advertisement attacking President Carter as follows:

> ... [T]his advertisement was not issue-oriented speech of the sort that the Supreme Court was careful to distinguish in *Buckley,* and the Second Circuit found to be excluded from coverage of the Act in *Central Long Island Tax Reform.* The ad directly attacked [President Carter], *not because of any stand on the issues of the election,* but for his personal qualities and alleged improprieties in the handling of his campaign. It is the type of advertising the Act was intended to cover. *Id.* at 865. (emphasis added).

As stated, the same cannot be said with respect to CAN's advertisements. Both the television commercial and the print ads specifically addressed the election issue of homosexual rights. While the ads were negative, they assailed political views rather than indiscriminately attacking the candidates. Therefore, the Defendants' advertisements are substantively different from the ad in *Furgatch.*

## Conclusion

Over the past decade political advertising has taken on an increasingly derisive tone. More and more, at both the state and federal levels, advertisements are disseminated for the purpose of stirring emotion rather than provoking lucid political discussion. With the onslaught of television into our daily lives, this type of politicking has increased exponentially. Nevertheless, the proper way

to combat negative campaigning is not to increase government regulation over it.[20] Especially, when the increase in government regulation would be based on a profound misreading of the Supreme Court's interpretations of FECA's provisions.

The court appreciates that the FEC is in the precarious position of attempting to thwart the misuse of corporate funds to back or discredit candidates, while at the same time attempting to avoid undue government regulation of protected political speech. *See Central Long Island Tax Reform,* 616 F.2d at 55 (Kaufman, C.J.) (Concurring) "*Buckley v. Valeo* imposed upon the FEC the weighty, if not impossible, obligation to exercise its powers in a manner harmonious with a system of free expression.") Drawing that line has never been easy and the recent proliferation of negative advertising only makes it more difficult.

In this case, however, the FEC's position is unsupportable. To be sure, the Defendants' advertisements "clearly identified" candidates Clinton and Gore and were negative of the positions they held with respect to homosexual rights. But negative attacks on candidates' political views, without more, do not suffice to meet the standard enunciated in *Buckley v. Valeo.*

Therefore, it is the opinion of the court that the Defendants' advertisements do not constitute express advocacy and are not subject to regulation under FECA. Furthermore, because the court is convinced that there is no set of facts which the Commission could prove which would alter this result, the Defendants' motion must be granted. The remaining issues raised by the Defendants' need not be addressed. An appropriate order shall be entered this day.

## *FINAL ORDER*

In accordance with the Memorandum Opinion entered this day, it is hereby

---

20. It must be remembered that the our First Amendment jurisprudence is based on the proposition that the truth, whether it be the position of a case of thousands or simply that of one right thinking individual, will eventually prevail if more, not less, speech is provided to the public. As Justice Brandeis thoughtfully stated, "[i]f there be time to expose through discussion the

falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095, (1927), *reversed in part on other grounds,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**960**

ADJUDGED AND ORDERED

that the Defendants' motion to dismiss is GRANTED. The Clerk of Court is instructed to strike the case from the court's active docket and to send certified copies of this Order and accompanying Memorandum Opinion to all counsel of record.

**PHOTO 1**
"Clinton's Visions For A
Better America"

**PHOTO 2**
"Clinton's Visions For A
Better America"

**PHOTO 3**
"Clinton's Visions For A
Better America"

**PHOTO 4**
"Clinton's Vision For A
Better America"

**PHOTO 5**
"Clinton's Vision For A
Better America"

**PHOTO 6**
"Clinton's Vision For A
Better America"

**PHOTO 7**
"Clinton's Vision For A
Better America"

**PHOTO 8**
"Clinton's Vision For A
Better America"

Federal Election Commission
v. Christian Action Network

PHOTO 9