Filed:  May 5, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 95-2600
(CA-94-82-L)

Federal Election Commission,

Plaintiff - Appellant,

versus

Christian Action Network, Inc., et al,

Defendants - Appellees.

O R D E R

The Court amends its opinion filed April 7, 1997, as follows:

On page 8, first paragraph, line 4 -- "Brief for Respondent in Opposition" is corrected to read "Brief in Opposition."

On page 13, second full paragraph, line 5 -- the parenthetical ("Opp. Mem.") after the word "Fees" is deleted.

On page 15, first paragraph, lines 4-5 -- the lines are changed to read ". . . Appellant's Opposition to Fees at 8, and upon the timing of the communication, <u>see</u> <u>id</u>. at 10 . . . ."

On page 17, first paragraph, line 1 after indented quotation -- "Opp. Mem." is changed to read "Appellant's Opposition to Fees."

On page 28, footnote 13, line 1 -- the spelling is corrected in "sl<u>e</u>ight-of-hand."

On page 29, first full paragraph, line 10 -- "FEC's Opposition to <u>Certiorari</u>" is changed to read "FEC Opposition to <u>Certiorari</u>."

On page 30, first full paragraph, line 25 -- "Opp. Mem." is changed to read "Appellant's Opposition to Fees."

For the Court - By Direction


/s/ Patricia S. Connor
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FEDERAL ELECTION COMMISSION,
Plaintiff-Appellant,

v.

CHRISTIAN ACTION NETWORK,
INCORPORATED; MARTIN MAWYER,

No. 95-2600

Defendants-Appellees.

DEMOCRATIC NATIONAL COMMITTEE;
AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA,
Amici Curiae.

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
James C. Turk, District Judge.
(CA-94-82-L)

Submitted: November 29, 1996

Decided: April 7, 1997

Before RUSSELL and LUTTIG, Circuit Judges, and
CHAPMAN, Senior Circuit Judge.

_____

Fees and other expenses awarded and case remanded by published
opinion. Judge Luttig wrote the opinion, in which Judge Russell and
Senior Judge Chapman joined.

_____

**COUNSEL**

Lawrence M. Noble, General Counsel, Richard B. Bader, Associate
General Counsel, David Brett Kolker, FEDERAL ELECTION COM-

MISSION, Washington, D.C., for Appellant. David William T. Carroll, II, Columbus, Ohio; Frank M. Northam, WEBSTER, CHAMBERLAIN & BEAN, Washington, D.C., for Appellees. Stephen B. Pershing, Legal Director, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Amicus Curiae ACLU. Joseph E. Sandler, General Counsel, DEMO-CRATIC NATIONAL COMMITTEE, Washington, D.C.; Donald B. Verrilli, Paul M. Smith, Washington, D.C.; Daniel H. Bromberg, Washington, D.C., for Amicus Curiae Committee.

_____

**OPINION**

LUTTIG, Circuit Judge:

The Supreme Court of the United States held in Buckley v. Valeo, 424 U.S. 1 (1976), and reaffirmed in FEC v. Massachusetts Citizens For Life, Inc., 479 U.S. 238 (1986), that corporate expenditures for political communications violate 2 U.S.C. § 441b(a) only if the communications employ "explicit words," "express words," or "language" advocating the election or defeat of a specifically identified candidate for public office. In the underlying litigation, the Federal Election Commission advanced the position that the Christian Action Network violated section 441b(a) through corporate expenditures for a commercial in which the following text was read by a narrator:

> Bill Clinton's vision for America includes job quotas for homosexuals, giving homosexuals special civil rights, allowing homosexuals in the armed forces. Al Gore supports homosexual couples' adopting children and becoming foster parents. Is this your vision for a better America? For more information on traditional family values, contact the Christian Action Network.

Although conceding that the Christian Action Network's advertisements did not employ "explicit words," "express words," or "language" advocating the election or defeat of a particular candidate for public office, the FEC nonetheless contended that the Network's expenditures for these advertisements violated section 441b(a)

2

because the advertisements "unmistakably""expressly advocated" the defeat of then-Governor Clinton in the presidential election of 1992, through the superimposition of selected imagery, film footage, and music, over the nonprescriptive background language.

On the authority of <u>Buckley</u> v. <u>Valeo</u> and <u>FEC</u> v. <u>Massachusetts Citizens For Life</u> ("<u>MCFL</u>"), the district court dismissed the FEC's action against the Network for failure to state a claim upon which relief could be granted, holding that, as "issue advocacy intended to inform the public about political issues germane to the 1992 presidential election," the advertisements were "fully protected as `political speech' under the First Amendment." <u>Federal Election Commission</u> v. <u>Christian Action Network</u>, 894 F. Supp. 946, 948 (W.D. Va. 1995). In so holding, the district court refused the FEC's invitation to examine the "meaning behind the images" which appear in the Network's television commercial.**1** <u>Id</u>. at 958. We, in turn, summarily affirmed on the reasoning of the district court, characterizing the interpretation advanced by the Commission as "unsupportable." <u>Federal Election Commission</u> v. <u>Christian Action Network</u>, 92 F.3d 1178, 1996 WL 431996 (4th Cir. 1996) (per curiam) (adopting district court opinion, 894 F. Supp. at 959). Before us now is a request by the Network, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, for fees and costs incurred in connection with the FEC's prosecution and appeal of this matter. Because the position taken by the FEC in this litigation was foreclosed by clear, well-established Supreme Court caselaw, and it is apparent from the Commission's selective quotation from and citation to those authorities that the agency was so aware,

_____

**1** The FEC argues that the district court accepted the Commission's theory that "imagery" can constitute "express advocacy," but merely rejected the agency's specific contention in this case that the imagery in the video expressly advocated the defeat of Governor Clinton. <u>See</u> Appellant's Br. at 9; Opposition to Defendant-Appellee's Application for Fees at 4. This is simply incorrect. While one sentence in the district court's opinion, if read in isolation, would permit such a reading, <u>see</u> 894 F. Supp. at 948 ("The advertisements at issue do not contain explicit words <u>or imagery</u> advocating electoral action."), the district court repeatedly emphasized that it "[could not] accept the FEC's invitation to delve into the meaning behind the image. To expand the express advocacy standard enunciated in <u>Buckley</u> in this manner would be to render the standard meaningless," <u>see id</u>. at 958.

3

we conclude that the Commission's position, if not assumed in bad faith, was at least not "substantially justified" within the meaning of 28 U.S.C. § 2412(d)(1)(A), and therefore that the Christian Action Network is entitled to the requested fees and costs under the Equal Access to Justice Act.**2**

I.

A.

In Buckley v. Valeo, in order to eliminate what otherwise would have been the unconstitutional overbreadth of the Federal Election Campaign Act of 1971, as amended in 1974, the Supreme Court interpreted the statutory phrase "relative to," see 18 U.S.C. § 608(e)(1) (repealed in 1976),**3** so that the section would only prohibit corporate expenditures for "express advocacy" -- "communications that include explicit words of advocacy of election or defeat of a candidate," id. at 43 (emphasis added), or "communications containing express words of advocacy of election or defeat," id. at 44 n.52 (emphasis added). See also id. at 80 n.108. That is, the Court held that the Federal Election Campaign Act could be applied consistently with the First Amendment only if it were limited to expenditures for communications that literally include words which in and of themselves advocate the election or defeat of a candidate. The Court even provided an illustrative list of the kinds of "express words of advocacy" the use of which in corporately-funded communications could violate section 608(e)(1):

_____

**2** Because disposition of the merits of Christian Action Network's motion for fees and expenses (as opposed to the amounts of such fees and expenses awardable) entails a simple, straightforward application of clear principles of law announced by the Supreme Court, and the district court's view of the FEC's position is evident in the court's thorough opinion, we are satisfied that, in this particular case, the merits of the motion are most appropriately resolved in this forum in the interest of judicial economy.

**3** Section 608(e)(1) provided in relevant part that "no person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."

4

> This construction [of section 608(e)(1)] would restrict the application of [the provision] to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."

Id. at 44 n.52.

The Court adopted the bright-line limitation that it did in Buckley in order to protect our cherished right to political speech free from government censorship. Recognizing that "the distinction between discussions of issues and candidates [on the one hand] and advocacy of election or defeat of candidates [on the other] may often dissolve in practical application," id. at 42, the Court concluded, plain and simple, that absent the bright-line limitation, the distinction between issue discussion (in the context of electoral politics) and candidate advocacy would be sufficiently indistinct that the right of citizens to engage in the vigorous discussion of issues of public interest without fear of official reprisal would be intolerably chilled. Thus, the Court reasoned:

> [W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.

> Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

Id. at 43 (quoting Thomas v. Collins, 323 U.S. 516, 535 (1945)). The Court opted for the clear, categorical limitation, that only expenditures for communications using explicit words of candidate advocacy are prohibited, so that citizen participants in the political processes

5

would not have their core First Amendment rights to political speech burdened by apprehensions that their advocacy of issues might later be interpreted by the government as, instead, advocacy of election result. See Buckley at 43 ("The constitutional deficiencies described in Thomas v. Collins can be avoided only by reading § 608(e)(1) as limited to communications that include explicit words of advocacy of election or defeat of a candidate.") (emphasis added). The Court could have drawn the line between permissible and impermissible expenditures differently, but a different line would have come at the cost of expanded regulatory authority in a sphere where government regulation, if it is to be permitted at all, must be viewed with the utmost suspicion -- a cost the Court had no difficulty concluding was too high for the incremental additional "benefits" that would be obtained by vesting broader power in the government, and in particular in the FEC.

The Court's commitment to a limited role for the government in the regulation of corporate political expenditures, and specifically its commitment to an interpretation of the Constitution that permits the prohibition only of corporate political communications that employ express words of advocacy, was reaffirmed a full decade after Buckley, in MCFL. There, the Court interpreted section 441b of the Federal Election Campaign Act, 2 U.S.C. § 441b(a), "the more intrusive provision" of the Act, see MCFL, 479 U.S. at 249, which prohibits corporations from using treasury funds to make any "contribution or expenditure in connection with" any federal election. Observing that Buckley's rationale, that the divide between discussion of issues and candidates and election advocacy is so obscure as to require a prophylactic definition in order to give the widest berth to First Amendment freedoms, was equally applicable to expenditures under section 441b(a), the Court unanimously engrafted onto section 441b(a) Buckley's "express advocacy" limitation. Citing to footnote 52 in Buckley, the Court reiterated its holding that "a finding of `express advocacy' depend[s] upon the use of language such as `vote for,' `elect,' `support,' etc." Id. (quoting Buckley, 424 U.S. at 44 n.52) (emphasis added). And, consistent with its reaffirmation of Buckley's "explicit words of advocacy" standard, the Court concluded that "[j]ust such an exhortation" appeared in the voter guides at issue in that case, which identified particular pro-life candidates by name and

6

with photographs and urged voters to vote for those candidates through the "explicit directive" "VOTE PRO-LIFE." Id. at 243, 249.

That the Court in Buckley and MCFL unambiguously limited the Federal Election Commission's regulatory authority over corporate expenditures to those for communications that use explicit words of advocacy has been uniformly recognized by the lower courts.

In one of the first appellate cases following Buckley, the Second Circuit flatly rejected the FEC's definition of "express advocacy." FEC v. Central Long Island Tax Reform Immediately Committee, 616 F.2d 45 (2nd Cir. 1980) (en banc) ("CLITRIM"). The Second Circuit found the FEC's position, which, like that urged by the FEC in this case, would have allowed the FEC to regulate "implied" communications that "encourag[ed]" election or defeat, to be "totally meritless." Id. at 53. Admonishing that the Supreme Court's interpretations of sections 434(e) and 441d "clearly establish that, contrary to the position of the FEC, the words `expressly advocating' mean exactly what they say," the court warned that the FEC's position would effectively "nullify" the Supreme Court's decision in Buckley. Id.

Seven years later, and less than a month following the Court's decision in MCFL, the Ninth Circuit in FEC v. Furgatch, 807 F.2d 857 (9th Cir.), cert. denied, 484 U.S. 850 (1987), could not have been clearer that it, too, shared this understanding of the Court's decision in Buckley.**4** Although the court declined to "strictly limit" express advocacy to the "magic words" of Buckley's footnote 52 because that footnote's list does "not exhaust the capacity of the English language to expressly advocate election or defeat of a candidate," id. at 862-63,

_____

**4** Curiously, the Ninth Circuit never cited or discussed the Supreme Court's opinion in MCFL, notwithstanding that MCFL was argued in the Supreme Court three months prior to the decision in Furgatch and decided by the Court almost a month prior to the Court of Appeals' decision. The Ninth Circuit does discuss the First Circuit's opinion in MCFL, but without noting that certiorari had been granted to review the case. See 807 F.2d at 861. Thus, the Furgatch court relied upon Buckley alone, without the reaffirmation provided by the Court in MCFL, for its conclusion that explicit "words" or "language" of advocacy are required if the Federal Election Campaign Act is to be constitutionally enforced.

the entire premise of the court's analysis was that words of advocacy such as those recited in footnote 52 were required to support Commission jurisdiction over a given corporate expenditure. See, e.g., FEC Brief in Opposition to Certiorari in Furgatch at 4 (explaining that the Ninth Circuit's opinion "emphasize[s] that the statute was narrowly limited to communications containing language `susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.'" (emphasis added)). In fact, it is only because the court believed that the word combinations that could constitute express advocacy were many that it rejected the suggestion that "the `express advocacy' language of Buckley . . . [drew] a bright and unambiguous line," Furgatch, 807 F.2d at 861.

The court explained that individual words or sentences of the message cannot be considered in isolation, but, rather, must be considered together with the other words and sentences that appear in the communication, in determining whether the message is one of election advocacy:

> A proper understanding of the speaker's message can best be obtained by considering speech as a whole. Comprehension often requires inferences from the relation of one part of speech to another. The entirety may give a clear impression that is never succinctly stated in a single phrase or sentence. Similarly, a stray comment viewed in isolation may suggest an idea that is only peripheral to the primary purpose of speech as a whole. Furgatch would have us reject intra-textual interpretation and construe each part of speech independently, requiring express advocacy from specific phrases rather than from speech in its entirety.

> We reject the suggestion that we isolate each sentence and act as if it bears no relation to its neighbors. This is not to say that we will not examine each sentence in an effort to understand the whole. We only recognize that the whole consists of its parts in relation to each other.

Id. at 863. Then, although noting how "[w]ords derive their meaning from what the speaker intends and what the reader understands," the

8

court declined to place too much importance on intent because "to fathom [the speaker's] mental state would distract [the court] unnecessarily from the speech itself." Id. And, finally, although the court refused to foreclose resort to contextual considerations external to the words themselves, it explained that external context must necessarily be an "ancillary" consideration because it is "peripheral to the words themselves," id., and it pointedly noted that such "context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words," id. at 864.

Having established that the emphasis must always be on the literal words of the communication, with little if any weight accorded external contextual factors, the court proceeded to outline what it considered to be "a more comprehensive approach to the delimitation of `express advocacy.'" Id. at 862. In so doing, the court repeatedly emphasized that the message of candidate advocacy must appear in the speech, in the words, of the communication if the expenditure of corporate funds for that communication is to be prohibited:

> We conclude that speech need not include any of the words listed in Buckley to be express advocacy under the Act, but it [the speech] must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.

Id. at 864 (emphases added). The court's almost exclusive focus on "speech," and specifically "speech" defined as the literal words or text of the communication, could not have been any clearer, as the following passage in explanation of its conclusion confirms:

> This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or

9

defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the <u>reader</u> to take some other kind of action.

We emphasize that if any reasonable alternative <u>reading of speech</u> can be suggested, it cannot be express advocacy subject to the Act's disclosure requirements.

<u>Id</u>. (emphases added).**5**

Indeed, the simple holding of <u>Furgatch</u> was that, <u>in those instances where political communications do include an explicit directive to voters to take some course of action</u>, but that course of action is unclear, "context" -- including the timing of the communication in relation to the events of the day -- may be considered in determining whether the action urged is the election or defeat of a particular candidate for public office. <u>See id</u>. at 865 ("We hold . . . that this failure to state with specificity the action required does not remove political speech from the coverage of the Campaign Act when it is clearly the kind of advocacy of the defeat of an identified candidate that Con-

_____

**5** Contrary to its assertions, the Commission's regulatory definition of "express advocacy" does not parallel this test. According to the FEC:

> [l]ike the first prong in <u>Furgatch</u>, the Commission's regulation requires the "electoral portion of the communication [to be] unmistakable, unambiguous, and suggestive of only one meaning" (11 C.F.R. § 100.22(b)(1)). Like the second and third prongs, the Commission's regulation requires that"[r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action" (11 C.F.R. § 100.22(b)(2)).

Appellant's Reply Br. at 9 (footnote omitted). It is plain that the FEC has simply selected certain words and phrases from <u>Furgatch</u> that give the FEC the broadest possible authority to regulate political speech (<u>i.e.</u>, "unmistakable," "unambiguous," "suggestive of only one meaning," "encourage[ment]", 807 F.2d at 864), and ignored those portions of <u>Furgatch</u>, quoted above, which focus on the words and text of the message.

10

gress intended to regulate."). As the FEC described <u>Furgatch</u> in opposing a grant of <u>certiorari</u> in that case:

> The court of appeals' assessment of Mr. Furgatch's advertisement under [the "express advocacy"] standard turns upon the particular facts of this case, and thus does not necessarily indicate how courts will assess other communications in other circumstances. Such a fact-dependent determination does not warrant plenary review by this Court, particularly since the Court discussed the proper application of the express advocacy standard only last Term in <u>FEC</u> v. <u>Massachusetts Citizens for Life, Inc.</u>, 107 S. Ct. at 623, and applied it in a manner consistent with that of the court of appeals in this case.

FEC Opposition to <u>Certiorari</u> in <u>Furgatch</u> at 7.

In emphasis of the language of the communication, the court's analysis focused on the words of the advertisement at issue in the case, "DON'T LET HIM DO IT," and, specifically, on the words "DON'T LET HIM." <u>Furgatch</u>, 807 F.2d at 864; <u>see also</u> FEC Opposition to <u>Certiorari</u> in <u>Furgatch</u> at 4 ("The court found that the <u>language</u> of Mr. Furgatch's advertisement left `no doubt that the ad asks the public to vote against Carter.'" (emphasis added)). The court characterized these words as "simple and direct" words of "command," which "`expressly advocate[d]' action of some kind." <u>Furgatch</u>, 807 F.2d at 864. Although acknowledging that whether the words constituted express advocacy was a "very close call," <u>id</u>. at 861, the court ultimately held that "[r]easonable minds could not dispute that [the] advertisement urged readers to vote against Jimmy Carter . . . [because] [t]his was the only action open to those who would not `let him do it,'" <u>id</u>. at 865. It noted the fact that the advertisement appeared one week before the 1980 presidential election; however, the court explained, that fact only served to "reinforce" its determination based upon the language of the advertisement. <u>Id</u>.**6**

---

**6** The Ninth Circuit did use other, "soft" language when describing the framework within which the express advocacy determination is to be made. For example, the court stated broadly that it "must read section

11

Bridging the decade between Furgatch and today, the First Circuit, in Maine Right to Life Committee v. FEC, recently even invalidated that portion of the FEC's new regulatory definition of "express advocacy" which, in substance, is the definition the FEC urged upon us.**7** And, it did so on the authority of Buckley and MCFL -- indeed, in express reliance upon the very district court opinion that we affirmed in the litigation underlying the present application. See 98 F.3d 1 (1st Cir. 1996) (affirming per curiam "for substantially the reasons set forth" by the district court in 914 F. Supp. 8 (D. Maine 1996))

_____

434(c) so as to prevent speech that is clearly intended to affect the outcome of a federal election from escaping, either fortuitously or by design, the coverage of the Act," id. at 862. Under the facts of the case, these broader observations were obviously dicta. As the FEC said in opposing certiorari in Furgatch:

> [Petitioner Furgatch] takes issue with a number of the lower court's general statements regarding law and policy, taken out of their context in a lengthy and discursive opinion. . . . Petitioner's disagreements with the Ninth Circuit's general discussion of express advocacy provide no basis for granting plenary review.

See FEC Opposition to Certiorari at 9 (emphases added). But, to the extent that they do represent an intentional departure by the Ninth Circuit from the standard set forth by the Supreme Court in Buckley and MCFL, they were just that.

**7** In relevant part, the FEC's new regulatory definition of "express advocacy," which became effective October 5, 1995, provides,

> Expressly advocating means any communication that . . .

> (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because --

> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

11 C.F.R. § 100.22(b).

12

("MRLC"). The court even awarded costs to the Maine Right to Life Committee in connection with its defense of the FEC's suit. MRLC, 98 F.3d 1. Reasoning that the "bright line" created by the Supreme Court's insistence upon explicit words of advocacy for the election or defeat of a particular candidate permits free discussion of "things that affect the election process, but at all costs avoids restricting, in any way, discussion of public issues," the First Circuit held, as have we, that both Buckley and MCFL unequivocally require "express" or "explicit" "words of advocacy of election or defeat of a candidate." MRLC, 914 F. Supp. at 10-12.

And the First Circuit's rejection of the FEC's arguments as to the meaning of "express advocacy" is only the most recent in a string of losses in cases between the FEC and issue advocacy groups over the meaning of the phrase "express advocacy" and the permissible scope of the FEC's regulatory authority over corporate political speech. See, e.g., FEC v. Christian Action Network, 894 F. Supp. 946 (W.D. Va.), aff'd per curiam, 92 F.3d 1178, 1996 WL 431996 (4th Cir. 1996); FEC v. Survival Education Fund, No. 89 Civ. 0347, 1994 WL 9658 (S.D.N.Y. Jan. 12, 1994), aff'd in part and rev'd in part on other grounds, 65 F.3d 285, 290 (2nd Cir. 1995); FEC v. Colorado Republican Federal Campaign Committee, 839 F. Supp. 1448 (D. Co.), rev'd on other grounds, 59 F.3d 1015 (10th Cir.), vacated on other grounds, 116 S. Ct. 2309 (1996); Faucher v. FEC, 928 F.2d 468 (1st Cir.), cert. denied, 502 U.S. 820 (1991); FEC v. National Organization for Women, 713 F. Supp. 428 (D.D.C. 1989); FEC v. Central Long Island Tax Reform Immediately Committee, 616 F.2d 45 (2nd Cir. 1980); FEC v. American Federation of State, County and Municipal Employees, 471 F. Supp. 315 (D.D.C. 1979).

B.

Against this overwhelming weight of (and, in the case of the Supreme Court decisions, dispositive) authority, the FEC argued before the district court and before us the concededly "novel" position, see Appellant's Opposition to Defendant-Appellees' Application For Fees at 13, that, even though the Christian Action Network's advertisements did not include any explicit words or language advocating Governor Clinton's defeat, the expenditure of corporate funds for these advertisements nonetheless violated section

13

441b because, considered as a whole with the imagery, music, film footage, and voice intonations, the advertisements' nonprescriptive language unmistakably conveyed a message expressly advocating the defeat of Governor Clinton. That is, the FEC argued the position that "no words of advocacy are necessary to expressly advocate the election of a candidate," Appellant's Br. at 25 (emphasis in original), that an advertisement which does not include any "express words of advocacy" may nevertheless constitute "express advocacy" as defined by the Supreme Court in Buckley and MCFL, provided it unmistakably conveys a message urging action with respect to a particular candidate for public office.

Thus, according to the Commission's arguments, it could regulate under the standard of "express advocacy" any "terms," any "communications," which "unmistakably" or "unambiguously" "encourage" voters to take "some kind of action" for or against a candidate, whether or not those communications take the form of "words" or "language" "expressly" or "explicitly" "advocating" the election or defeat of a particular candidate at the polls. See Appellant's Br. at 11; 11 C.F.R. § 100.22(b). Buckley's requirement of "explicit words" would be satisfied by the use of non-verbal "terms." See Appellant's Br. at 23. MCFL's (and Buckley's) insistence upon "language" of advocacy would be satisfied by any communicative form of expression. See 11 C.F.R. § 100.22(b). And, where "express" "advocacy" has been required, "unmistakable" "encouragement" would suffice. See also Brief of Amicus Curiae Democratic National Committee in Support of Appellants ("DNC Br.") at 10 (arguing that federal regulation applies to "speech that is unambiguously aimed at influencing voters").

Stripped of its circumlocution, the FEC's argument was (and is) that the determination of whether a given communication constitutes "express advocacy" depends upon all of the circumstances, internal and external to the communication, that could reasonably be considered to bear upon the recipient's interpretation of the message. The right to engage in political speech would turn on an interpretation of the "imagery" employed by the speaker. See Appellant's Br. at 26-27 ("Symbols, pictures, and images can have the same potent communicative effect as [ ] verbal expressions."). It would depend upon the perceived "charge" of the "rhetoric" used, see Appellant's Br. at 12-

14

13, 37 n.18 (noting FEC's belief that the controversial and provocative character of a communication is an "important factor" in demonstrating that the communication has an unmistakable electoral message); Appellant's Opposition to Fees at 8, and upon the timing of the communication, see id. at 10 (stressing the importance of the "context and timing" of speech). The right would be contingent upon one's mere identity or association, as the following exchange between the court and FEC counsel reveals:

> The Court: And [the advertisement is] only bad if you believe that the voters disagree with the message about homosexuality there. For those voters who agree with the message, why is it a negative ad?
>
> Mr. Kolker: Well, I think, I think it's clear to a reasonable person that the Christian Action Network thinks these things are bad . . . . I think that the ardent gay rights activist would view this ad as a message from the Christian Action Network to vote against Clinton. That they believe his views on homosexuals are wrong . . . .
>
> The Court: That's only if you bring to the table an understanding of what the Christian Action Network is.
>
> * * *
>
> Mr. Kolker: It's a self-defined group using the label Christian Action.

Oral Arg. Trans. at 11-13. The FEC thus argues that "[w]hen included as part of the message, the speaker's identity becomes part of the communication itself, and what matters is not what the viewer or the courts will infer about the speaker's intent, but what a reasonable person, informed about the speaker's identity (and thus potential biases and passions), understands the communication to mean." Appellant's Br. at 36-37; see also id. at 42 ("The very fact that an organization professing `traditional family values' chooses to broadcast images that they themselves plainly find offensive sends a powerful message about the measures that are appropriate to prevent Clinton's `vision'

15

from becoming the policy of the United States."); <u>id</u>. at 13 ("Ordinary viewers seeing that a `Christian' group has deliberately chosen to broadcast -- shortly before election day -- provocative images of gay men parading in black leather clothing, could not fail to understand that the video is espousing extreme measures to prevent Clinton from implementing his national agenda."). Under certain circumstances, as the following exchange shows, the right could even be withdrawn merely because the speaker expresses disagreement with a candidate over a particular issue:

> Mr. Kolker: . . . If all you're doing is mentioning an issue to say that their candidate's position on it is wrong, it is not a real discussion of the issue, the focus of the ad is the candidate --
>
> The Court: -- So you can't link the candidate with the issue, that's what --
>
> Mr. Kolker: No, I think you can but not if all you're doing is saying the candidate believes X and X is the wrong position. . . .
>
>                 * * *
>
> Mr. Kolker: [I]t's clear from the ad that the way that final [rhetorical] question [in the television ad] forcefully is spoken, that from the speaker's perspective, it's the wrong vision. And what I'm saying is the candidate has a position, he's wrong on the position. There's no real issue discussion. It's just an attack on the candidate.

Oral Arg. Trans. at 15-16.

To quote the following passage, in which the FEC articulates some of the multitude of factors that would be considered under its interpretation in determining whether a given communication was prohibited, is to appreciate the breadth of power that the FEC would appropriate to itself under its definition of "express advocacy":

16

[E]xpress electoral advocacy [can] consist[ ] not of words alone, but of the combined message of words and dramatic moving images, sounds, and other non-verbal cues such as film editing, photographic techniques, and music, involving highly charged rhetoric and provocative images which, taken as a whole, sen[d] an unmistakable message to oppose [a specific candidate].

Appellant's Opposition to Fees at 8. This is little more than an argument that the FEC will know "express advocacy" when it sees it.

C.

The FEC's enforcement action against the Christian Action Network in this case brings into relief the extent to which, under the FEC's interpretation of "express advocacy," political speech would become hostage to the vicissitudes of the Commission, because, although a viewer could interpret the Network's video as election advocacy of the defeat of Governor Clinton, another viewer could just as readily interpret the video as issue advocacy on the question of homosexual rights. Indeed, the commercial and advertisements that the FEC here contend fall squarely within its regulatory purview are precisely the kinds of issue advocacy that the Supreme Court sought to protect in Buckley and MCFL; and the FEC's interpretation of these advertisements is exactly that contemplated by the Court when it warned of the constitutional pitfalls in subjecting a speaker's message to the unpredictability of audience interpretation, see Buckley, 424 U.S. at 43. Cf. Appellant's Reply Br. at 8 (conceding that Network's television commercial and newspaper advertisements "[took] a position against Clinton's purported positions on gay rights and thus contain issue advocacy," but contending that these communications "also contain[ed] express electoral advocacy"); Appellant's Br. at 13 ("[The advertisement's] explicit focus was on Clinton's presidential campaign agenda, not a more general discussion of gay rights.").**8**

_____

**8** The district court described the Christian Action Network's television commercial as follows:

The television advertisement consisted of a thirty second spot entitled "Clinton's Vision for a Better America." [footnote omit-

17

The text of the television advertisement is nonprescriptive, taking no position whatever, implied or otherwise, on the candidacy of Governor Clinton and Senator Gore, or even on the issue of homosexual rights. In its entirety, the text reads as follows:

> Bill Clinton's vision for America includes job quotas for homosexuals, giving homosexuals special civil rights,

_____

> ted.] It opens with a full-color picture of candidate Bill Clinton's face superimposed upon an American flag, which is blowing in the wind. Clinton is shown smiling and the ad appears to be complimentary. However, as the narrator begins to describe Clinton's alleged support for "radical" homosexual causes, Clinton's image dissolves into a black and white photographic negative. The negative darkens Clinton's eyes and mouth, giving the candidate a sinister and threatening appearance. [citation omitted.] Simultaneously, the music accompanying the commercial changes from a single high pitched tone to a lower octave.

> The commercial then presents a series of pictures depicting advocates of homosexual rights, apparently gay men and lesbians, demonstrating at a political march. While the narrator discusses the candidates' alleged agenda for homosexuals, short captions paraphrasing their positions are superimposed on the screen in front of the marchers. These images include: marchers carrying a banner saying "Libertarians for Gay and Lesbian Concerns" accompanied by the superimposed text "Job Quotas for Homosexuals"; the same banner accompanied by the superimposed text "Special Rights for Homosexuals"; two individuals with their arms around each others shoulders and text saying "Homosexuals in the Armed Forces"; and a man wearing a shirt which reads "Gay Fathers" with the text "Homosexuals Adopting Children." [citation omitted.]

> As the scenes from the march continue, the narrator asks in rhetorical fashion, "Is this your vision for a better America?" Thereafter, the image of the American flag reappears on the screen, but without the superimposed image of candidate Clinton. At the same time, the music changes back to the single high pitched tone. The narrator then states, "[f]or more information on traditional family values, contact the Christian Action Network." [footnote and citation omitted.]

Christian Action Network, 894 F. Supp. at 948-49.

18

allowing homosexuals in the armed forces. Al Gore supports homosexual couples' adopting children and becoming foster parents. Is this your vision for a better America? For more information on traditional family values, contact the Christian Action Network.

Absent the final sentence, which adds nothing of advocacy to the preceding text, these words could well have appeared in a commercial approved by Governor Clinton himself and advocating his own election; it is a matter of public record that then-Governor Clinton and now-President Clinton considers expanded homosexual rights as an important part of his vision for the Country. The FEC's own brief quotes President Clinton in a May 1992 speech to a gay and lesbian audience as promising that "I have a vision, and you are part of it". See Appellant's Br. at 41 n.21.**9**

The video's nonprescriptive language is no more incontrovertibly an exhortation to vote against Governor Clinton when spoken with the

_____

**9** See also, Steven A. Holmes, Clinton Would Outlaw Job Bias Against Gays, Ft. Lauderdale Sun-Sentinel, Oct. 20, 1995 (quoting October 1995 letter from President Clinton to Senator Kennedy that "[t]hose who face this kind of job discrimination have no legal recourse . . . . This is wrong."); Michael Isikoff, Gays Mobilizing for Clinton as Rights Become an Issue, The Washington Post, Sept. 28, 1992 (reporting that "[Clinton] released formal position papers on gay issues that essentially pledged him to virtually the entire mainstream gay political agenda . . . [including] sign[ing] an executive order ending the U.S. military policy discriminating against homosexuals, support[ing] legislation to amend federal civil rights laws to include sexual orientation,`appoint[ing] gays and lesbians to major positions' in his administration and launch[ing] a `Manhattan-type Project' to find a cure for AIDS."); Thomas L. Friedman, Clinton to Lift Ban on Gays[,] He Reassures Military, Veterans He'll be Tough on National Security, The Kansas City Star, Nov. 12, 1992 (reporting that "President-elect Clinton said Wednesday that he plans to lift the ban on homosexuals in the military after he takes office in January"); Paul Taylor, Democratic Rivals Back Tougher S. Africa Sanctions, The Washington Post, April 13, 1988 (reporting April 1988 Democratic Presidential Primary debate where three candidates, including "Sen. Albert Gore Jr. (D-Tenn.)[,] . . . supported . . . the right of homosexuals to serve as foster parents").

19

inflection and overlaid with the imagery, music, and film footage which served as the backdrop for the text. Entitled"Clinton's Vision for a Better America," the video opens with a complimentary, full-color photograph of Governor Clinton, which quickly fades into a black-and-white photographic negative and then almost immediately disappears, as a narrator recites the above text and as three pictures of pro-homosexual rights parades rapidly flash across the screen. The very short advertisement concludes with the narrator asking rhetorically, "Is this your vision for a better America? For more information on traditional family values, contact the Christian Action Network." This is simply not express advocacy of the defeat of Governor Clinton; the advertisement urges no action upon viewers at all, beyond contacting the network for more information on traditional family values should they wish, much less action at the polls. Far from a commercial that would be "instantly recognizable by any voter as a negative ad against the candidacy of Bill Clinton," see Appellant's Br. at 13, the video could just as readily be viewed as passionate issue advocacy on the important question of homosexual rights -- the very kind of speech which the Supreme Court has held the First Amendment jealously protects.

The two print advertisements, which the FEC urges that we consider in tandem with the television video, are even less susceptible to characterization as election advocacy.[10] Moreover, they tend, if any-

_____

[10] The district court described the print advertisements in this way:

> Shortly after the CAN's television commercial began airing, the Chairman of the Democratic National Committee, Ron Brown, wrote a letter to various television stations and cable operators. In his letter, Chairman Brown asked the television media to discontinue running the commercial because he believed it to be "patently offensive" and "false." In response to this letter, CAN published a full page advertisement on October 15, 1992 in the Richmond Times-Dispatch. This date was approximately two weeks after the television commercial had begun airing. It also coincided with a nationally televised debate among the 1992 presidential candidates, which was held that evening in Richmond, Virginia. The newspaper advertisement was entitled "An Open Letter To: Gov. Bill Clinton, Democratic Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman", and

20

thing, to confirm that the video not only was, but was intended to be, more issue advocacy on the question of homosexual rights than elec-

_____

stated that it was "paid for by the Christian Action Network. . . ." Importantly, however, the advertisement failed to state whether it was authorized by any candidate or committee. The body of the letter reads as follows:

> The Christian Action Network is now airing television ads in Richmond, VA <u>informing the voting public</u> of Gov. Bill Clinton's support of the "gay rights" political agenda.
>
> <u>The voting public has a right to know</u> that Gov. Bill Clinton's agenda includes (1) job quotas for homosexuals, (2) special civil rights for homosexuals and (3) allowing homosexuals in the U.S. Armed Forces.
>
> Not surprisingly, the Democratic leadership has opposed our television ads.
>
> That's why Ron Brown, chairman of the Democratic National Committee, is now sending letters to television and cable operators asking them not to run our advertisement.
>
> In his letter, Mr. Brown accuses our ads of being"patently offensive" and "false." But the letter fails to point out any "false" or "patently offensive" information in our ad campaign.
>
> Here are the documented facts in defense of our ads which have also aired in Los Angeles, Houston, Cincinnati, Washington, D.C., Atlanta, San Diego, Seattle, Dallas, Santa Rosa, Cleveland, Chicago and other major cities.
>
> <u>First</u>, Gov. Clinton supports civil rights laws for homosexuals.
>
> From a Clinton/Gore campaign paper titled, "Issues of Concern to Gays and Lesbians" are these words: "A Clinton/Gore Administration will support a federal gay civil rights bill." This position paper was received from the Democratic National Committee and paid for by the "Clinton/Gore '92 Committee."
>
> <u>Second</u>, Gov. Clinton will allow homosexuals in the military.
>
> From the same position paper cited above: "Bill Clinton will issue executive orders to repeal the ban on gays and les-

bians from military and foreign service."

21

tion advocacy for the defeat of the Governor. These advertisements, which were entitled "An Open Letter to Gov. Clinton, Democratic

_____

Third, Gov. Clinton supports job quotas for homosexuals.

The Democratic Party Platform states it will "provide civil rights protection for gay men and lesbians."

George Stephanopoulos, Mr. Clinton's spokesman, said Gov. Clinton supports affirmative action for gays and lesbians because laws were needed to protect workers' rights. Gov. Clinton has also promised that he will "appoint gays and lesbians to major positions in his administration." [Washington Post September 28, 1992]

The Christian Action Network has informed Gov. Bill Clinton and DNC Chairman Ron Brown that it will change its commercial if Clinton will publicly dispute any point made in CAN's commercial, promise as president to veto legislation that gives gays specific protection under the Civil Rights Act and oppose affirmative action for gays.

The Christian Action Network has yet to hear verbal or written communication from Gov. Clinton, Mr. Brown or any other official of the Democratic National Party.

During tonight's debate -- or anytime thereafter-- I, Martin Mawyer, president of the Christian Action Network, call upon Gov. Bill Clinton to clearly state his position on gay rights and publicly state what is "patently offensive" and "false" in our television commercial.

When the Clinton/Gore campaign committee publicly and unequivocally retract their commitments to the "gay rights" community, the Christian Action Network will halt its television campaign. [citation omitted] (emphasis added).

CAN never received a response from the Clinton election team or any member of the Democratic National Committee. As a result, on October 26, 1992, the Defendants placed another full page newspaper ad. This time the advertisement was published in the Washington Times and was entitled"Since You Did Not Respond to Our Ad in Richmond; An Open Letter To: Gov. Bill Clinton, Democratic Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman." The second newspaper ad was substantively identical to its predecessor. However, the second ad contained a statement that it was not authorized by any candidate. Furthermore, it failed to state that it was a paid political advertisement.

Christian Action Network, 894 F. Supp. at 949-50.

22

Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman" and "Since You Did Not Respond to Our Ad in Richmond; An Open Letter to Gov. Clinton, Democratic Presidential Candidate [and] Mr. Ron Brown, Democratic Party Chairman," and which appeared in the <u>Richmond Times-Dispatch</u> on October 15, 1992, and the <u>Washington Times</u> on October 26, 1992, respectively, were written in response to criticism by Ron Brown that the Christian Action Network's television commercial was untrue. These advertisements essentially repeated in print the text of the television advertisement, adding specific citations for the assertions made, and then concluded with the promise that the network would

> change its commercial if Clinton will publicly dispute any point made in CAN's commercial, promise as president to veto legislation that gives gays specific protection under the Civil Rights Act and oppose affirmative action for gays . . . .

> When the Clinton/Gore Campaign committee publicly and unequivocally retract their commitments to the "gay rights" community, the Christian Action Network will halt its television campaign.

Like the television video, these letters are, at most, "openly hostile to the [pro-homosexual rights] proposals believed to have been endorsed by" candidates Clinton and Gore. <u>Christian Action Network</u>, 894 F. Supp. at 953; <u>see also</u> Brief of <u>Amicus Curiae</u> American Civil Liberties Union of Virginia in Support of Appellees ("ACLU Br.") at 21. The only action they urge is that Governor Clinton, Senator Gore, and Mr. Brown abandon their positions on the various public issues concerning homosexual rights, as the district court found. <u>See Christian Action Network</u>, 894 F. Supp. at 954 ("any call for action encompassed in the advertisements was directed at the candidates and Chairman Brown, not the voting public.").

In sum, unlike even the advertisement in <u>Furgatch</u>, which was "bold in calling for action, but fail[ed] to state expressly the precise action called for," <u>Furgatch</u>, 807 F.2d at 865; <u>see also</u> FEC Opposition to <u>Certiorari</u> in <u>Furgatch</u> at 8 (noting that Furgatch's advertisement included "explicit exhortation"), in neither the video nor in the print advertisements at issue in this case is there any action urged with

23

respect to any candidate. There are no words expressly advocating the defeat of Governor Clinton in the 1992 presidential election, or, for that matter, any words urging voters to take any action whatsoever as to the Governor. As the district court found, these advertisements are simply "devoid of any language that directly exhorted the public to vote" for or against any particular candidate. See Christian Action Network, 894 F. Supp. at 953. They presented viewers "with the candidates' views on homosexual rights and told [them] that [those views] sharply contrasted with those held by the[Christian Action Network][,] [but] [t]he only immediate action called for by the commercial was for viewers to contact CAN if they agreed with the [Network's] opposition to a `gay rights agenda,'" id. at 954, and the only action called for by the newspaper advertisements was for candidates Clinton and Gore to repudiate their positions with respect to homosexual rights. Just as the FEC argued in opposition to certiorari in Furgatch that "[t]he only exhortation in the leaflet" at issue in FEC v. Central Long Island Tax Reform Immediately Committee, 616 F.2d 45 (2nd Cir. 1980) (en banc) ("CLITRIM"), "called for communication with the congressman on the issue of taxes, not action against him," see FEC Opposition to Certiorari at 8 n.4, the advertisements here called only for viewers to contact the Christian Action Network and for Governor Clinton and Senator Gore to abandon their positions on homosexual rights, not for election action against these candidates.

Yet, the FEC would have us confer power upon it to regulate these advertisements because, in its assessment,

> [t]o the ordinary viewer in 1992, the CAN video unmistakably encourages voters to defeat Bill Clinton. The video communicates the following: A group explicitly aligning itself with Christian, heterosexual, and traditional family values graphically depicts a specific presidential candidate supporting homosexual men vividly asserting their sexual preferences; the message attacks Clinton's moral judgment and alleged policy agenda; those positions involve steps that only a federal elected official could take; the message is delivered to viewers who live in states where Governor Clinton has no contemporaneous authority to set policy; the message is televised shortly before the presidential election; and the message employs powerful symbolism and persua-

24

sive devices unique to the medium of video . . . . The video admittedly contains no literal phrase such as "Defeat Bill Clinton." But it contains a special kind of charged rhetoric and symbolism that exhorts more forcefully and unambiguously than mere words.

Appellant's Br. at 37-38. Or, because, in the words of the "expert" whom the FEC retained to assist it in its action against the Christian Action Network:

> [T]his 30 second television spot expressly advocated the defeat of candidates Clinton and Gore in the upcoming presidential general election. It did so by employing the techniques of audio voice-overs, music, visual text, visual images, color, codewords, and editing. In their totality, these techniques said voters should defeat Clinton and Gore because these candidates favor extremist homosexuals and extremist homosexuals are bad for America.

See J.A. at 65, 77 (Prof. Darrell M. West, Brown University, An Analysis of Ads Run by the Christian Action Network, Inc. in 1992).

Even absent binding Supreme Court precedent, we would bridle at the power over political speech that would reside in the FEC under such an interpretation. The American Civil Liberties Union observes in its amicus brief in support of the Christian Action Network that if the FEC's interpretation were to prevail, "ads attacking an identified candidate's political positions during a campaign[would] virtually always, if not per se, amount to `express advocacy' of that candidate's defeat at the polls." ACLU Br. at 3. And, from the Commission's argument that advertisements which "make it absolutely clear that [the group sponsoring the ads] considers homosexual behavior and the support of additional rights for gay men and lesbians to be abhorrent" can "only reasonabl[y]" be interpreted as "asking others to join its fight to defeat Clinton and thereby foreclose his asserted homosexual rights agenda," see Appellant's Br. at 40, this would appear to be precisely the consequence of the agency's interpretation.

D.

Whether we would agree with the FEC's interpretation of its authority under the Federal Election Campaign Act, or find its inter-

25

pretation reasonable, were this a matter of first impression, however, is not ultimately the question. The question for us is only whether the FEC was "substantially justified" in taking the position it did, in light of the Supreme Court's unambiguous pronouncements in Buckley and MCFL that explicit words of advocacy are required if the Commission is to have standing to pursue an enforcement action. The simple answer to this question must be that it was not so justified. As we stated in adopting the district court's opinion, the FEC's position was based not only "on a misreading of the Ninth Circuit's decision in Furgatch," but also on a "profound misreading" of the Supreme Court's decisions in both Buckley and MCFL. Christian Action Network, 894 F. Supp. at 958-59.

From the foregoing discussion of Buckley and MCFL, it is indisputable that the Supreme Court limited the FEC's regulatory authority to expenditures which, through explicit words, advocate the election or defeat of a specifically identified candidate. In the portion of Buckley in which the Court addresses the overbreadth of the Federal Election Campaign Act and adopts its limiting construction of section 608(e)(1)'s term "relative to," the Court does not even use the phrase "express advocacy," upon the purported "ambiguity" of which the FEC builds its diffuse definition. In this most important portion of the opinion, cf. DNC Br. at 5, the Court only refers to "explicit words of advocacy," "express terms," and "express words of advocacy." See Buckley, 424 U.S. at 43-44. It is not until the Court interprets the statutory term "expenditure" in section 434(e) to include the same limitation as in section 608(e)(1), forty pages later in the opinion, that the Court even uses the phrase "express advocacy," see id. at 80. But even there, the Court confirms through footnote 108's cross-reference to footnote 52, in which the Court lists the kinds of words that would warrant exercise of the FEC's regulatory authority, that it meant by the phrase "express advocacy" nothing more or less than "express words of advocacy."**11** In other words, the Court itself in Buckley con-

_____

**11** The textual sentence in which the footnote call for note 108 appears reads as follows: "To insure that the reach of § 434(e) is not impermissibly broad, we construe `expenditure' for purposes of that section in the same way we construed the terms of § 608(e)-- to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80 (footnote 108 omitted). The

26

firmed that it intended the phrase "express advocacy" simply as a shorthand for the "explicit words of advocacy of election or defeat" "of a clearly identified candidate for federal office," which it had held earlier in the opinion were required in order to save the Act from constitutional infirmity.

Were this alone not sufficient to establish that the Court meant by "express advocacy" "express words of advocacy," then the Court's subsequent discussion in MCFL removes all doubt. There, because it was interpreting the statutory term "expenditure," the Court cited to Buckley's discussion of section 434(e), rather than to that case's discussion of section 608(e)(1), and used the shorthand phrase "express advocacy." See MCFL, 479 U.S. at 248-49. The Court then went on to define "express advocacy," again through citation to its footnote 52 in Buckley, to mean "express words of advocacy." See id. at 249 (citing Buckley, 424 U.S. at 44 n.52). It even stated that in Buckley it had concluded "that a finding of `express advocacy' depend[s] upon the use of language such as `vote for,' `elect,' `support,' etc." MCFL, 479 U.S. at 249 (citing Buckley, 424 U.S. at 44 n.52) (emphasis added).**12**

The FEC is fully aware that the Supreme Court has required explicit words of advocacy as a condition to the Commission's exercise of power, as evidenced by its own dissembling before this court.

_____

footnote call for note 108 appears immediately after the words "expressly advocate." Footnote 108, cross-referencing note 52, reads in full as follows: "See n. 52, supra[,]" id., which, it bears repeating, reads that the construction of section 608(e)(1) adopted by the Court would restrict application of that section "to communications containing express words of advocacy of election or defeat, such as `vote for,' `elect,' `support,' `cast your ballot for,' `Smith for Congress,'`vote against,' `defeat,' `reject,'" Buckley, 424 U.S. at 44 n.52.

**12** The FEC argues throughout its submissions that the Supreme Court "never suggested that communications can constitute express advocacy only if they include specific words from a special list." Appellant's Br. at 23. This is true, but it is a red-herring. Most certainly, the Court never said this. But, just as certainly, the Court never suggested that communications with no words of advocacy at all can nonetheless be considered "express advocacy." In fact, as we show, it actually held precisely the opposite.

27

See generally Thomasson v. Perry, 80 F.3d 915, 939-41 (4th Cir. 1996) (Luttig, Circuit Judge, concurring); Commonwealth v. Riley, 106 F.3d 559, 565-66 (4th Cir. 1997). The FEC's extensive submissions in this case include notably little discussion of the legal analysis in either Buckley or MCFL. Throughout the FEC's entire 69 pages of briefing on the merits of this case, it never once quotes any of the numerous passages in Buckley and MCFL referring to "explicit words" or "express words" or "language" of advocacy. Nor does it once quote Buckley's footnote 52. Compare DNC Br. at 5 (quoting footnote 52 in full, including Buckley's"express words" locution). The significance of this omission is illustrated by the fact that not a single district court or court of appeals opinion has ever addressed Buckley's "express advocacy" standard without quoting one or more of these passages or at least referring to Buckley's requirement of "words" of advocacy. The agency even goes so far as to quote the very sentence from page 80 of Buckley in which the Court uses the phrase "express advocacy" and defines that phrase in the sentence's footnote 108 to mean "express words of advocacy," see note 11 supra, but to omit any reference, by parenthetical or otherwise, to the fact that footnote 108 appears in that sentence. Compare DNC Br. at 4, 10 (quoting sentence and noting that footnote was omitted).**13** The agency does make a single reference to Buckley's phrase "express terms" of advocacy so that it can advance the argument that the term "terms" includes "modes of expression" other than"words," an argument in support of which it cites "Webster's II New Riverside University Dictionary." Appellant's Br. at 22-23 ("`Terms' means `language or a mode of expression used' and is not limited to expression through words.") (emphasis added; footnote omitted). But, even then, the

---

**13** The FEC resorts to the same sleight-of-hand in its discussion of the Ninth Circuit's decision in Furgatch. According to the FEC, the court of appeals in that case said that "courts must take care to avoid an unnecessarily narrow application of express advocacy to prevent `eviscerating the Federal Election Campaign Act.'" Appellant's Br. at 18. In fact, what the Ninth Circuit said was that "[a] test requiring the magic words `elect,' `support,' etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the Federal Election Campaign Act." 807 F.2d at 863. In light of our discussion herein, the difference is of enormous significance.

28

Commission fails to note that the very sentence in which this phrase appears is the sentence to which footnote 52 is appended.

That the Commission knows well the Court's holdings in <u>Buckley</u> and <u>MCFL</u> is further confirmed by the agency's subsequent action in <u>Furgatch</u>, which we referenced <u>supra</u> at 8-11. Because <u>Furgatch</u>, despite its narrow holding, does include broad <u>dicta</u> which can be read (or misread) to support the FEC's expansive view of its authority,**14** the agency vigorously opposed <u>certiorari</u> in the case. Wishing to have the opinion preserved intact, the Commission in its submissions there, in contrast to its submissions before this court, quoted <u>Buckley</u> as "requir[ing] `explicit <u>words</u> of advocacy of election or defeat of a candidate.'" FEC Opposition to <u>Certiorari</u> at 9 n.5 (quoting <u>Buckley</u>, 424 U.S. at 43) (emphasis added). The Commission even took the position that <u>Furgatch</u> did, as we noted above, interpret the Federal Election Campaign Act's corporate disclosure statutes as"narrowly limited to communications containing <u>language</u> `susceptible to no other reasonable interpretation but as an exhortation to vote,'" <u>id</u>. at 4 (quoting <u>Furgatch</u>, 807 F.2d at 864) (emphasis added); <u>see also id</u>. ("The court found that the <u>language</u> of Mr. Furgatch's advertisements left `no doubt that the ad asks the public to vote against Carter.'" (emphasis added)). Moreover, the FEC argued to the Supreme Court that <u>Furgatch</u> was fully consistent with <u>Buckley</u> and <u>MCFL</u> precisely because the opinion focused on the specific language of Furgatch's advertisement and concluded that express advocacy existed only because the advertisement "explicitly exhorted" voters to defeat then-President Carter. Thus, there is no doubt the Commission understands that its position that no words of advocacy are required in order to support its jurisdiction runs directly counter to Supreme Court precedent.

_____

**14** <u>See</u> FEC Opposition to <u>Certiorari</u> at 9-10:

> [Petitioner Furgatch] takes issue with a number of the lower court's general statements regarding law and policy, taken out of their context in a lengthy and discursive opinion. It is well settled, however, that "[t]his Court . . . reviews judgments, not statements in opinions." . . . Petitioner's disagreements with the Ninth Circuit's general discussion of express advocacy provide no basis for granting plenary review.

II.

In the face of the unequivocal Supreme Court and other authority discussed, an argument such as that made by the FEC in this case, that "no words of advocacy are necessary to expressly advocate the election of a candidate," simply cannot be advanced in good faith (as the disingenuousness in the FEC's submissions attests), much less with "substantial justification." See e.g., Pierce v. Underwood, 487 U.S. 552, 568-71 (1988) (holding that "views expressed by other courts on the merits," and in particular "a string of losses," together with the "actual merits of the Government's litigating position," are central to issue of whether position was "substantially justified"). It may be that "[i]mages and symbols without words can also convey unequivocal meaning synonymous with literal text." Appellant's Br. at 28. It may well be that "[m]etaphorical and figurative speech can be more pointed and compelling, and can thus more successfully express advocacy, than a plain, literal recommendation to `vote' for a particular person[,]" and that "it would indeed be perverse to require FECA regulation to turn on the degree to which speech is literal or figurative, rather than on the clarity of its message," "[g]iven that banal, literal language often carries less force." Appellant's Br. at 25-26. It may even be, as the FEC contends in this particular case, that "the combined message of words and dramatic moving images, sounds, and other non-verbal cues such as film editing, photographic techniques, and music, involving highly charged rhetoric and provocative images . . . taken as a whole[ ] sent an unmistakable message to oppose [Governor Clinton]." Appellant's Opposition to Fees at 8. But the Supreme Court has unambiguously held that the First Amendment forbids the regulation of our political speech under such indeterminate standards. "Explicit words of advocacy of election or defeat of a candidate," "express words of advocacy," the Court has held, are the constitutional minima. To allow the government's power to be brought to bear on less, would effectively be to dispossess corporate citizens of their fundamental right to engage in the very kind of political issue advocacy the First Amendment was intended to protect -- as this case well confirms.

For the reasons stated, the case is remanded to the district court for a determination of the amount of fees and costs properly awardable to the Christian Action Network under the authority of the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), such amounts to

30

include the relevant fees and costs incurred before the district court and this court, including those fees and costs incurred in pursuing the motion presently before us, see Commissioner, Immigration and Naturalization Service v. Jean, 496 U.S. 154, 160 (1990).

SO ORDERED

31